549 So.2d 833 (1989)
Richard Jere SHOPF
v.
MARINA DEL RAY PARTNERSHIP.
No. 89-C-0152.
Supreme Court of Louisiana.
September 12, 1989.
*834 Robert E. Leake, Jr., Leake & Anderson, for applicant.
Thomas D. Fazio, McCollister, McCleary & Fazio, for respondent.
LEMMON, Justice.
This case involves the determination of the amount to which plaintiff is entitled under La.C.C. art. 2823 from the Marina Del Ray Partnership (the Partnership) as the value of plaintiff's twelve percent partnership share after he withdrew from the Partnership in accordance with La.C.C. art. 2822.[1]
Facts
In 1983 Louis Ray began a venture in which he intended to develop a marina and a commercial and residential complex on the Tchefuncta River and LA. Highway 22 in St. Tammany Parish. The development was to be called Marina Del Ray. Later that year Robert Claitor purchased from Ray a fifty percent interest in the project for $150,000. Claitor subsequently transferred this interest to R.G. Claitor Realty *835 Company and to various trusts set up for his four children.
Ray and Claitor Realty, as partners of Marina Del Ray Partnership, thereafter entered into an employment contract with plaintiff, whereby plaintiff was employed as general manager of the Partnership for a period of one year, beginning December 1, 1983. The contract provided for a specified monthly salary, as well as for additional compensation as follows:
As an incentive Shopf will receive a Twelve (12%) per cent partnership interest in the Partnership at a cost of ONE AND NO/100 ($1.00) DOLLAR paid to the Partnership.... The Twelve (12%) per cent partnership interest to be initially acquired will reduce the partnership interest of Louis F. Ray.
In March, 1984, Ray, Claitor Realty and the trustees of the Claitor trusts executed articles of partnership, which were subsequently filed with the Secretary of State.[2] The articles provided for an ordinary partnership for the following purposes:
[T]o acquire, own, develop, lease, sell and manage real and personal property to be used for apartment projects, commercial offices, marinas, condominiums, shopping centers and other commercial and residential real estate developments located within and without the State of Louisiana; to furnish service to the tenants or occupants of such properties; to finance by mortgage or otherwise the acquisition, improvement and/or maintenance of such property; and to lease or acquire and finance real, personal or mixed property appurtenant thereto or used in connection therewith.
In April of 1984 Claitor Realty purchased thirty-two percent of Ray's partnership interest for $135,000. At the same time Ray donated the remaining six percent of his interest to Claitor.[3]
In July, 1984, the Partnership obtained a $2,500,000 loan committment for long-term financing to complete the first phase of the development. The lender made a $300,000 advance to the Partnership, and Claitor and plaintiff both signed a continuing guaranty for the remainder of the $2,500,000 loan. In response to a request by the lender, the articles of partnership were amended to reflect the twelve percent interest owned by plaintiff, the withdrawal of Ray as a partner, the increase in the partnership interest of Claitor Realty to seventy-seven percent, and the six percent interest owned by Claitor.[4]
On July 11, 1984, the same day the continuing guaranty was signed, Claitor (who was then managing partner of the Partnership) notified plaintiff that his employment as general manager would not be continued when the employment contract expired in November. Claitor further stated that he was assuming managerial authority for the development. At the same time Claitor offered either to sell plaintiff 6.194% of Claitor Realty's interest and 1.161% of Claitor's interest for $3,552.63 per point, plus thirteen percent interest from the date Claitor obtained these interests from Ray, or to purchase plaintiff's twelve percent interest for the same price per point. Plaintiff declined to accept either offer.
Having learned shortly after signing the continuing guaranty that his employment with the Partnership as general manager would not be continued, plaintiff immediately returned to the lender $200,000 of the $300,000 advance, stating his intent to cancel his continuing guaranty. Claitor then fired plaintiff as general manager, effective immediately, on the grounds that plaintiff *836 had breached his fiduciary duty to the Partnership by returning the funds. Plaintiff responded by filing suit for damages for breach of the employment contract.
On October 24, 1984, plaintiff formally withdrew as a partnership member by sending a "Notice of Withdrawal as Partner" to the Partnership and filing a copy with the Secretary of State. The remaining partners apparently elected to continue the partnership entity in existence.
When plaintiff and the remaining partners could not agree as to the value of plaintiff's share, plaintiff instituted the present action by filing a "Petition to Determine and Compel Payment of Partnership Interest". He demanded a judicial determination of the sum due him for the value of his twelve percent share pursuant to La.C.C. arts. 2823-2825.[5]
In both suits the Partnership filed a reconventional demand for damages for plaintiff's violation of his fiduciary duties and pleaded set-off and compensation against any sums awarded plaintiff.
The two suits were consolidated for trial. As to plaintiff's claim for payment of his share, the trial court held that plaintiff's twelve percent share had no value on the date of his withdrawal.[6] The trial court noted:
Testimony at trial indicated that due to a failing economy, the venture as of the time of the termination of Shopf had a negative book value. Plaintiff contends that value should be based on future development of the Marina. However, the court finds that placing a value on the future development of the project is so speculative, as to be of no value in determining partnership worth.
Plaintiffs demand in this respect was therefore dismissed with prejudice.
Both plaintiff and the Partnership appealed. The court of appeal affirmed, holding that there was no manifest error in the trial court's acceptance of the testimony of the Partnership's experts that the partnership entity had a negative book value at the time plaintiff withdrew. 539 So.2d 1320.
We granted plaintiff's application for certiorari to determine the correctness of the ruling that plaintiff's partnership share had zero value on October 24, 1984, the date of his withdrawal.[7] 541 So.2d 835.
Applicable Civil Code Provisions
The codal articles on partnership were revised in 1980. The new articles provide that when a partnership has been constituted without a specific term, a partner may withdraw at any time without the consent of his partners, provided he gives reasonable notice in good faith at a time that is not unfavorable to the partnership.[8] La. *837 C.C.art. 2822. The withdrawal does not automatically terminate the partnership, but merely causes the cessation of the membership of the withdrawing partner. See La.C.C. art. 2818, Revision Comment (a).
Although the partnership does not automatically terminate upon withdrawal of a partner, the remaining partners may, by unanimous consent, terminate the partnership. La.C.C. art. 2826. In the event of termination of the partnership, the partnership assets are divided according to La.C.C. arts. 2833-2834.
Once a partner has withdrawn from the partnership which continues to exist, he is not entitled to an interest in the assets of the partnership, because the assets belong to the partnership entity. See La.C.C. art. 2823, Revision Comment (a). However, the Code recognizes the former partner's entitlement to "an amount equal to the value that the share of the former partner had at the time membership ceased", and the value of the share must be paid in money, unless otherwise agreed, together with legal interest from the time membership ceases.[9] La.C.C. art. 2823-2824. When there is no agreement on the amount to be paid, any interested party may apply for a judicial determination of the value of the share and for a judgment ordering its payment.[10] La.C.C. art. 2825.
Thus, it is only in the event that the partnership continues in existence after withdrawal of a partner and only in the absence of any agreement between the partners that the court is called upon to determine the value of the partnership interest.
In the present case the articles of partnership did not provide for a specific term, and plaintiff exercised his right of withdrawal under Article 2822. The partners did not agree in advance on the method of determining the value of a withdrawing partner's share. Once plaintiff withdrew, the remaining partners elected to continue the partnership, but plaintiff and the remaining partners could not amicably agree on a value to be assigned to plaintiff's interest.[11] The court was therefore called upon to determine the value of plaintiff's share and to render a judgment ordering payment.
Valuation
The Code does not contain a definition of the word "value" in Article 2825 which authorizes a request for a judicial determination of the value of the share. It is therefore up to the courts to determine the method of valuation.
The trial court determined that plaintiff's twelve percent interest had no value on October 24, 1984, at least in part because the partnership had a negative book value. Plaintiff argues that book value is not the proper test for determining the value of plaintiff's share in this case and that fair market value, as used in evaluating property in expropriation cases, is the more appropriate standard, in the absence of an *838 agreement to use book value or some other standard. In this regard plaintiff cites Anderson v. Wadena Silo Co., 310 Minn. 288, 246 N.W.2d 45 (1976), in which the court, construing the Minnesota statute (patterned after the Model Partnership Act) which provided for payment of "the value of his [partnership] interest at the date of dissolution", rejected book value as a basis for valuation and held that, in the absence of an agreement to the contrary, fair market value is the proper standard.
The Partnership concedes that fair market value, rather than book value, is the proper standard for determining the value of plaintiff's share in the partnership.[12] See also Bohn v. Bohn Implement Co., 325 N.W.2d 281 (N.D.1982); Chapman v. Dunnegan, 665 S.W.2d 643 (Mo.App. 1984). However, the Partnership argues plaintiff's share had zero value on the date of withdrawal because the fair market value of plaintiff's interest did not exceed the partnership liabilities. The Partnership emphasizes that the testimony of its experts supports its position that the fair market value of plaintiff's share was zero.
The Partnership's accountant testified that, as of September 30, 1984, the assets of the partnership had a value of $5,003,974.01 and the liabilities totalled $5,631,549.15.
A real estate appraiser presented by the Partnership valued the partnership assets at $2,500,000 as of the withdrawal date. In reaching this conclusion, the appraiser first listed the expenditures to date, including the acquisition of the land, the construction of a causeway connecting the marina area and the highway, the construction of a harbor master building, utilities, and 178 boat slips, and miscellaneous costs. The total of these expenditures was $3,680,000. He then stated his opinion that no buyer could be found within a reasonable time who would pay the amount the Partnership had expended for the land and the construction, since only ten boat slips had been leased and there was no other significant income expected in the near future. He further opined that the "very best case scenario" would be to find a buyer which would pay sixty-six to seventy percent of the total investment, or approximately $2,500,000.[13] The appraiser applied the discount on the basis of his belief that it would take an investor three years to recover the amount that had been spent.
Since plaintiff did not introduce any expert evidence, the Partnership contends that its evidence of value is unrebutted. On the other hand, plaintiff argues that the following factors established a substantial amount of value for his share on October 24, 1984:
1. In December, 1983, Claitor paid Ray $150,000 for fifty percent of the project, or $3,000 per point, at a time when the project was only a concept backed by an option to purchase and when no construction permits or bank financing were in place;
2. In April, 1984, Claitor Realty paid Ray $135,000 for a thirty-two percent interest in the partnership, or $4,218.75 per point (unless the six percent interest donated by Ray to Claitor is considered as part of the purchase price, which would reduce the value to $3,552.63 per point);
3. In July, 1984, Claitor offered to sell plaintiff a portion of the interest he had acquired from Ray for $3,552.63 per point, or to buy plaintiff's share at the same price; and
4. In September, 1984, shortly before the October 24, 1984 withdrawal date, Claitor represented in his personal financial statement, which he used for all business purposes, that the net value of his interest in the venture (at a time in which financing had been completed and construction *839 was ongoing) was $35,965 per point.
Plaintiff also argues that the appraiser should have assigned more weight to the potential development value of the venture as of October 24, 1984, especially since plaintiff withdrew during the developmental stages of the project. Plaintiff points out that development potential is part of fair market value in expropriation cases. State, Department of Highways v. Rapier, 246 La. 150, 164 So.2d 280 (La.1964). As to this factor, plaintiff notes the following:
1. In June, 1984, Claitor and plaintiff signed a loan application package which projected that the venture would be worth $50,000 per point by the end of 1986, if the development was successful;
2. In September, 1985, Claitor's financial statement reflected a net value of the venture at $62,395 per point;
3. In late 1985 or early 1986, Claitor represented in a loan application that a fair market value of the venture was $46,838 per point; and
4. In 1986, when the Partnership's property was listed for sale at $15,000,000, Claitor stated he would not even entertain an offer of $9,500,000.
Fair market value is defined generally as the price that a willing buyer would pay to a willing seller for a certain piece of property in an arm's length transaction, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. See Black's Law Dictionary 537 (rev. 5th ed 1979).
We agree with the Partnership's observation that the value listed in Claitor's financial statements and loan applications does not represent the price a willing buyer would pay for the property in an arm's length transaction, but rather represents the price an interested seller who has invested significant amounts of money in a speculative venture hopes to receive for his property. However, there are many other relevant factors established by the evidence in this case which preclude any reasonable conclusion that plaintiff's interest in the partnership had zero value on the pertinent date.
The prices paid by Claitor to purchase portions of Ray's interest in the Partnership at a time near the pertinent date are certainly relevant to the determination of value and compel the conclusion that plaintiff's interest was worth more than zero. The $3,552.63 per point price paid by Claitor for Ray's thirty-two percent interest three months before plaintiff's termination and six months before the withdrawal date is the most compelling comparable sale. Claitor and Ray were willing and knowledgable participants in the sale of shares of the same business entity at issue in this litigation (although Claitor's position as owner of shares in the same closely held business indicates less arm's length dealing in this transaction than in a sale to an outside investor). Moreover, Claitor's offer to purchase plaintiff's share for $3,552.63 per point, at the time of plaintiff's termination, is a reliable indictor of value.[14]
Apparently the Partnership's appraiser was not aware of these transactions. Additionally, because his approach to determining value focused on the immovable property rather than the share of the partnership in an ongoing development, he substantially disregarded the development potential.[15] *840 On the other hand, the prices paid by Claitor to Ray and offered by Claitor to plaintiff were necessarily based largely on development potential, which can be a significant factor in the appraisal of undeveloped or partially developed property. Therefore, the $3,552.63 per point price established in Claitor's dealings with his other partners, while subject to adjustment, is the most significant factor in the determination of fair market value.
The price of $3,552.63 per point must be adjusted to account for other considerations. Claitor's July, 1984 offer to plaintiff to sell or buy at that price was made in an effort to compromise a dispute over plaintiff's right to purchase a portion of the share Claitor had bought from Ray. Claitor's letter stated that the offer was only open for one week "after which we may or may not be interested at this price or some other price". Because of the dispute compromise element, this offer should not be accorded the same weight as a bona fide offer by a party interested only in buying the share.
The most significant adjustment must be made in recognition of the fact that plaintiff's share is a minority interest in a closely held business. The determination of the value of a fractional share in a business entity involves more than fixing the value of the business and multiplying by the fraction being evaluated, especially when the share is a minority interest. A minority interest may be uniquely valuable to the owner, but may have considerably less value to an independent third party, because the interest is relatively illiquid and difficult to market. G. Desmond & R. Kelley, Business Valuation Handbook, ¶ 11.01, 11.07 (1977).
Here, when Claitor paid Ray $3,552.63 per point and offered the same price to plaintiff, he already owned or controlled a majority of the shares and had more interest in increasing his percentage than an outside investor would have in acquiring a minority share in the venture. Accordingly, the $3,552.63 per point price must be discounted in order to determine the fair market value of plaintiff's share in a true arm's length transaction.
There is no testimony in this record discussing the applicability of a minority interest discount to plaintiff's share, but some reduction is clearly warranted. Under the circumstances of this case we apply a discount of one-third to the $3,552.63 per point price in the other transactions and fix $2,368.42 per point as the fair market value of plaintiff's share.
Accordingly, the judgments of the lower courts are reversed, and judgment is rendered in favor of plaintiff in the amount of $28,421.04, plus legal interest and all costs of the proceedings.
WATSON, J., dissents.
NOTES
[1] La.C.C. art. 2822 provides:

If a partnership has been constituted without a term, a partner may withdraw from the partnership without the consent of his partners at any time, provided he gives reasonable notice in good faith at a time that is not unfavorable to the partnership.
La.C.C. art. 2823 provides:
The former partner, his successors, or the seizing creditor is entitled to an amount equal to the value that the share of the former partner had at the time membership ceased.
[2] The articles reflected the names of the partners and their partnership interest as follows:

R.G. Claitor Realty 45%
James D. Claitor Trust 1.25%
Robert G. Claitor, Jr. Trust 1.25%
Daniel A. Claitor Trust 1.25%
Jon F. Claitor Trust 1.25%
Louis F. Ray 50%

Plaintiff was not listed as a partner in the original articles.
[3] Although the articles reflected that Ray owned a fifty percent interest, twelve percent of this interest had been transferred to plaintiff pursuant to the employment contract.
[4] The shares held by the trustees of the four trusts remained at a total of five percent.
[5] Article 2823 is quoted in footnote 1. Article 2824 provides:

If a partnership continues to exist after the membership of a partner ceases, unless otherwise agreed, the partnership must pay in money the amount referred to in Article 2823 as soon as that amount is determined together with interest at the legal rate from the time membership ceases.
Article 2825 provides:
If there is no agreement on the amount to be paid under Articles 2823 and 2824, any interested party may seek a judicial determination of the amount and a judgment ordering its payment.
[6] In the breach of contract action the trial court ruled that plaintiff was entitled to $506.74 in unpaid wages. The judge also found that plaintiff had breached his fiduciary duty to the Partnership and therefore was fired for cause. The judge, however, dismissed the Partnership's reconventional demand for damages for breach of fiduciary duty because the Partnership was not substantially damaged by the breach, the lender having reinstated the $200,000 advance within two days.
[7] Plaintiff's application for certiorari contained only one assignment of error, and certiorari was granted solely to consider the issue of the share's value at the time of withdrawal. In brief to this court filed after the granting of certiorari, plaintiff presented arguments relating to other issues arising from his involuntary termination. We choose not to address these additional issues.
[8] The recently revised partnership articles of the Quebec Civil Code were the most influential source materials for the committee charged with the Louisiana revision. See Introduction: 1980 Partnership Revision, Vol. 12, L.S.A.Civil Code. In a report on the Quebec revision, the commentators stated in relation to the Quebec counterpart of Article 2823:

Since dissolution is avoided, it was necessary to provide means by which the other partners might continue the partnership if they so desired, and which at the same time would allow the withdrawing partner or his successors, as the case may be, to receive the value of the withdrawing partner's share. Such is the aim of this article.
Quebec Civil Code Revision Office, Report on the Contract of Partnership 50 (1974).
[9] If the partnership does not continue to exist, either because the remaining partners unanimously agree to terminate or for some other reason, the withdrawing partner arguably may be relegated to obtaining the value of his share in the liquidation.
[10] An agreement as to value or as to the method of determining value may be specified in the original or in an amended partnership agreement, or all parties may agree after withdrawal as to the value of the withdrawing partner's interest. La.C.C. art. 2825, Revision Comment.
[11] The Partnership initially contended that plaintiff did not own a twelve percent interest at the time he withdrew, but rather that he was only entitled to obtain this interest upon completion of the one-year employment contract as general manager. This argument, however, was inconsistent with the articles of partnership, as amended in July of 1984, which reflected that plaintiff owned a twelve percent interest at that time. The employment contract also provided for plaintiff to retain a portion of his interest if, under certain conditions not present in this case, he was unable to complete his term of employment. The trial court accordingly found that plaintiff owned a twelve percent interest at withdrawal, although the share had no value.
[12] Of course, book value may be a factor to be considered in determining fair market value, but book value is not the sole factor.
[13] The appraiser apparently calculated sixty-eight percent of $3,680,000. This investment figure for appraisal purposes did not include other expenditures considered by the accountant, such as interest on the land investment and on the construction loans.
[14] Offers to purchase by third parties are clearly relevant, especially when the same property is involved. However, such offers have generally been excluded from evidence in expropriation cases because they are highly susceptible to fabrication. M. Dakin & M. Klein, Eminent Domain in Louisiana Ch. IV, § 5 (1970). This exclusion was criticized in Pugh, RelevancyOffers to Purchase, 22 La.L.Rev. 399 (1962). The present case differs, however, because the offer was made by one of the parties to the litigation over value.
[15] The appraiser evaluated the immovable property on March 14, 1986, estimating its value as of October 24, 1984, the date of plaintiff's withdrawal. Under cross-examination the appraiser admitted he did not assign any value to the potential development of the planned commercial area along the highway, of the planned 122 additional boat slips not yet constructed, or of the planned condominiums not yet built in October, 1984. He stated that he was not furnished with the development plan for his appraisal.

Further cross-examination showed that the appraiser had evaluated the same property in January, 1986 (two months before the date of the above appraisal) for the purpose of a loan to the Partnership. In the January, 1986 appraisal the expert emphasized the development potential of the property, noting that the remaining boat slips will be leased at prevailing rates which will generate income for the restaurant, lounges and boat service facilities, that full marina occupancy will enhance public income from the recreational facilities, that commercially-zoned property will be developed on the highway, and that residential lots can be made available for sale with the expenditure of very little additional capital. Capitalizing the potential income from boat slip rentals and related concessions and considering the potential land sales, he estimated the value at $5,240,000.
The record does not indicate any significant changes in the venture between October, 1984 and January, 1986.