736 So.2d 996 (1999)
R. LEWIS SMITH, JR., CPA (A Professional Accounting Corporation), Plaintiff-Appellant,
v.
JAMES, HARDY & SMITH, Defendant-Appellee.
No. 31,812-CA.
Court of Appeal of Louisiana, Second Circuit.
May 19, 1999.
*997 Hargrove, Pesnell & Wyatt By Scott C. Sinclair, Shreveport, Counsel for Appellant.
Frederick R. Parker, Jr., Shreveport, Jones, Odom, Spruiell & Davis, L.L.P. By Frank H. Spruiell, Jr., Shreveport, Counsel for Appellee.
Before BROWN, CARAWAY & PEATROSS, JJ.
PEATROSS, J.
Plaintiff, R. Lewis Smith, Jr., CPA, A Professional Accounting Corporation (hereinafter referred to as "Smith"), filed suit against the accounting partnership of James, Hardy & Smith (now James & Hardy, hereinafter referred to as the "Partnership"), for the purpose of determining the value of Smith's interest in the Partnership as of the date of Smith's withdrawal and of obtaining a judgment against the Partnership in that amount. The Partnership answered the suit and filed a reconventional demand seeking a determination of the value of the loss of the clientele who followed Smith when Smith withdrew from the Partnership and seeking a judgment against Smith in that amount. After a bench trial, judgment was rendered awarding nothing to either party due to the setoff in value of the amounts owed to each party. Smith devolutively appealed from this judgment, and the Partnership has answered the appeal.

*998 FACTS AND PROCEDURAL BACKGROUND

When Smith withdrew from the Partnership in the spring of 1996, the Partnership consisted of Roy W. James, Jr., CPA (A Professional Accounting Corporation) ("James"), Lonnie G. Hardy, Jr., CPA (A Professional Accounting Corporation) ("Hardy"), and Smith.[1]
The Partnership did not have a formal written partnership agreement, the only written agreement being a "Compensation Agreement Calendar Year 1992," dated June 15, 1992. Following the 1992 Compensation Agreement, the partners of the Partnership, through their respective representatives, met each year following tax season and agreed on their respective compensation.[2] The partners, however, did not reach any agreement with respect to their compensation levels for calendar year 1996. The partners did reach an agreement on compensation for the years 1992, 1993 and 1995. For those years, Smith's income percentages were 16.89%, 20.15% and 22.60%, respectively.[3] These percentages were a "blended" percentage consisting of Smith's base salary and his one-third share of any profits over the base salaries.
There were no written or verbal noncompetition agreements and no written or verbal agreements between the partners that provided that a withdrawing partner would have to compensate the Partnership in the event the withdrawing partner later provided services for clients who were formerly served by the Partnership. The following facts were stipulated to at trial:

1) Smith's Capital Account Balance $ 9,973.00
2) The Partnership's Net Income from
 1/1/96 to 4/30/96 70,133.00
3) The Partnership's Accrued Interest
 Payable at 4/30/96 1,390.00[4]
4) The Partnership's Accrued Payable
 to Heard, McElroy & Vestal
 (HMV)[5] at 4/30/96 18,516.00
5) Distributions to Smith through
 4/30/96 25,082.00
6) The Partnership was constituted without a term.
7) As of the date of withdrawal, the partners were
 Roy W. James, Jr., CPA, A Professional Accounting
 Corporation; Lonnie G. Hardy, Jr., CPA, A
 Professional Accounting Corporation; R. Lewis
 Smith, Jr., CPA, A Professional Accounting Corporation.
8) The Partnership did not terminate after Smith's
 withdrawal, but did change its name to James &
 Hardy.
9) The effective date of Smith's withdrawal is April
 30, 1996, and any valuations will be made based on
 that date.[6]
In its written ruling, the trial court found that (1) Smith's interest in the Partnership was 21.13%; (2) because of the seasonal nature of the accounting business, *999 the overhead allocation (discussed below) should be taken into account in determining value; (3) Smith is entitled to the return of the capital account balance of $9,973, together with the additional sum of $15,814;[7] (4) Smith had a fiduciary duty to the Partnership with regard to the client base; (5) Smith is liable to the Partnership for the value of the client base which was "taken;" and (6) the liability of the Partnership to Smith and the liability of Smith to the Partnership constitutes an offset such that neither party was entitled to recover from the other.
On appeal, Smith contends that the trial court erred in the following respects:
A. The determination of Smith's partnership interest;
B. Decreasing Smith's percentage by a so-called "overhead allocation" subsequent to Smith's withdrawal;
C. The valuation of the Accounts Receivable and Work-in-Process;
D. The valuation of Accrued Employee Vacation and Compensatory Time;
E. Decreasing Smith's interest in the Partnership by the value of the client base that chose to go with Smith.
In its answer to the appeal, the Partnership contended that the trial court erred in its valuations in not allowing it to recover any sum in its reconventional demand.

DISCUSSION

Smith's Percentage Interest
La. C.C. art. 2823 provides that a withdrawing partner is entitled to an amount equal to the value that the share of the former partner had at the time his membership ceased. Comment (a) to that article specifies that the former partner is not entitled to an interest in the assets of the partnership, but is only entitled to be paid an amount equal to the value of his interest, which may be determined judicially in accordance with La. C.C. art. 2825.[8] La. C.C. art. 2824 provides that if a partnership continues to exist after the withdrawal of one of its members, unless otherwise agreed, the partnership must pay in money the amount of the value of his interest in the partnership before his withdrawal as soon as that amount is determined, together with interest at the legal rate from the time membership ceases.[9]
*1000 We, therefore, must first address the issue of Smith's percentage interest in the Partnership at the time of Smith's withdrawal, as this is the figure that will eventually determine the overall award. La. C.C. art. 2803 provides that each partner participates equally in the profits and losses of the partnership, unless the partners have agreed otherwise. We are directed by the parties to look to the 1992 Compensation Agreement, which all of the partners signed, as a possible historical basis for Smith's percentage interest in the Partnership at the time of withdrawal.
The 1992 Compensation Agreement set forth a base salary to be paid to each partner with a provision that any profits in excess of those salaries were to be split equally among the partners. As previously stated, a partner's base salary, coupled with the partner's equal percentage of any profits, is referred to as that partner's blended percentage interest in the partnership. Although no other formal written agreement was ever perfected in the following years of the Partnership, the partners all testified that, generally, a verbal agreement regarding each partner's percentage was reached each year during a meeting of the partners held sometime shortly after the close of the tax season. There was some discrepancy concerning the exact nature of how those verbal agreements were applied and the consequences of the partners' failure to reach a new agreement for a given year. The trial court found Mr. Hardy's testimony to be most credible. Mr. Hardy testified that if a new agreement was not reached, the terms of the agreement of the previous year would then carry forward to the following year. We agree. This was the situation that occurred in 1994 when the Partnership could not reach a new base compensation agreement and utilized the 1993 base compensation agreement for the year 1994.
Unlike the trial court, however, which found Smith's interest to be 21.13% on the date of withdrawal, we find Smith's percentage interest at the time of his departure from the partnership in 1996 to be 22.60%. The evidence indicates that Smith's blended percentage interest in the partnership in 1995 was in that amount.[10] We will, therefore, value all further assets of the Partnership with this percentage.

Overhead Allocation
It is the Partnership's position that the accounting business is seasonal in nature, and since Smith was with the Partnership during the season in which the majority of the annual income is earned, Smith should have to bear an equal amount of the overhead costs of the Partnership as well, regardless of whether they occurred before of after Smith's withdrawal.[11] The Partnership, however, cites no legal authority, nor can its expert cite any accounting practice authority, in support of this argument.
During the trial of this matter, the Partnership's expert, Mr. Ralph J. Stephens, a CPA specializing in the valuation of companies, testified on cross-examination, that the accounting business is seasonal in nature, with the close of the season being at the end of income tax time in April of each year. Mr. Stephens admitted that the Partnership would be the recipient of all of the revenue generated from May 1996 *1001 through December 1996; and it should, therefore, also be the one to bear all of the costs to generate the revenues during that period, as evidenced by his following testimony:
Q. If James & Hardy are going to share all of the benefits from all of the revenues that are generated from May to December 1996, wouldn't you agree that they should bear all of the costs that are incurred to generate those revenues?
A. They should incur the cost
Q. Just
A. I am going to answer yes or no. They should incur the costs to generate those revenues.
Finally, Mr. Stephens admitted that he knew of no authority, accounting or otherwise, that supported his theory of allocating to Smith overhead of the Partnership incurred after Smith's withdrawal.
We, therefore, decline to allocate to Smith any expenses that were incurred after the date of Smith's withdrawal, April 30, 1996. Only those expenses incurred while Smith was practicing with the Partnership will be used in the overall calculation.

Accounts Receivable and Work-in-Process
While there is no dispute that Smith is entitled to a percentage of the value of the Partnership's accounts receivable and work-in-process, the parties disagree on the valuation of those assets. Smith argues that there should be no penalty for those accounts receivable or work-in-process that the Partnership was unable to collect. It is Smith's contention that if Smith had been informed of the delinquent accounts, an effort could have been made to collect the accounts; but, because Smith was not so informed, such an effort was precluded and Smith should, therefore, not be penalized. Smith cites no support for his argument. We, therefore, find no merit to Smith's argument and find it speculative at best. We will use the amount of actually-collected accounts, or $382,400 in Accounts Receivable and $21,243 in Workin-Process.

Accrued Vacation and Compensatory Time
We next address the issue of the valuation of the accrued employee vacation and compensatory time that is to be expensed to Smith. According to the testimony of Mr. Smith, Mr. James and Mr. Hardy, compensatory time is usually accrued by employees during the busy hours of tax time. The employees are compensated for overtime hours worked during tax time with an equal number of hours of time off during the less busy time of the year, subject to the approval of the partners.[12]
As we stated in our discussion of the overhead expenses, we find no authority, nor have we been presented with any authority by the Partnership, which would support allocating the expense of accrued vacation and compensatory time for the rest of the year to Smith. If all employees take their vacation and compensatory time in time off from work, there is no expense to the Partnership. If all or some of the employees, however, choose to save their vacation and compensatory time until the end of the year, at which time they are paid for any unused time, then it may become a substantial expense to the Partnership. We cannot allocate all of these expenses to Smith in the manner proposed by the Partnership because it is too speculative. Moreover, to allocate the vacation and compensatory time to Smith would be *1002 inconsistent with our decision on the handling of the allocation of overhead expenses. Instead, we adopt the figures Smith introduced at trial which represent the allocation of the annual vacation and compensatory time for which Smith would be responsible from January 1, 1996, to April 30, 1996, or $9,812.

Client Base
Finally, we address the issue of whether or not Smith is indebted to the Partnership for any amount concerning the clients who chose to go with Smith instead of remaining with the Partnership. The Partnership argues that the client base is an asset of the Partnership and, as such, should be valued as a Partnership asset, such as goodwill. We find no merit to this argument.
First, clients are not chattels that can be purchased, placed on the books and depreciated over the years. Clients are not owned by anyone, and, as such, they may choose at their whim who they wish to handle their accounting business. We, therefore, do not consider the clients who left the Partnership to be assets of the Partnership, nor do we consider them as "goodwill" of the Partnership, but as goodwill of each individual partner, because of the professional service aspect of the practice of accounting.
Louisiana jurisprudence, albeit in the context of the partitioning of community property in the instances of divorce, has consistently made the distinction between goodwill which attaches to the person because of the person's unique qualities and goodwill which attaches to the business because of the nature of the business. Professional accounting competence is personal to the accountant and cannot be attributed to the partnership because it is a personal relationship between accountant and client. Since goodwill must adhere to some principal property or right, it is therefore dependent upon the property or right of either the partnership or the individual or both. In examining the goodwill in this case, we find that it exists independent of the partnership. Absent the partnership, it exists; absent the accountant, it does not exist. It is, therefore, not an asset of the partnership. The partnership may profit from the personal relationship between accountant and client, but it cannot share in it. See Chance v. Chance, 29,591 (La.App.2d Cir.5/7/97), 694 So.2d 613; Preis v. Preis, 649 So.2d 593 (La.App. 3d Cir.11/2/94); McCarron v. McCarron, 498 So.2d 1139 (La.App. 3d. Cir.1986); Pearce v. Pearce, 482 So.2d 108 (La.App. 4th Cir.1986); Depner v. Depner, 478 So.2d 532 (La.App. 1st Cir.1985).[13]
Finally, assuming, arguendo, that a client base can be valued as an asset of the Partnership, the Partnership would actually owe Smith money. The Partnership's expert, Mr. Stephens, testified that the value of the entire client base was approximately $1,135,000 at the time of Smith's withdrawal and that Smith took $224,000 of that client base. Without subscribing to the accuracy of these calculations, we, nevertheless, show that under such a theory, Smith was actually entitled to take 22.60% of the client base, or $256,510. The Partnership would, therefore, actually owe Smith $32,510.

Value of Smith's Partnership Interest
Having resolved the above conflicts, we find Smith is entitled to recover in accordance with the following calculations:

Net Income through 4/30/96........ $ 70,133[14]
Accounts Receivable at 4/30/96 ... 382,400
Work-in-Process at 4/30/96 ....... 21,243
Trade Accounts Payable at 4/30/96 ( 27,774)
Accrued Interest Payable at
4/30/96 .......................... ( 1,390)

*1003
Accrued Vacation/Compensatory
Time at 4/30/96................... ( 9,812)
Accrued Payable to HMV at
4/30/96 .......................... ( 18,561)
 __________
 Net Income and Assets at
 4/30/96........................ 416,239
 Smith's Percentage Interest ... × 22.60 %
 __________
 Value of Smith's Interest at
 4/30/96........................ $ 94,070
 Distribution to Smith as of
 4/30/96........................ ( 25,082)[14]
 Smith's Capital Account at
 4/30/96........................ 9,973
 __________
Total amount due Smith............ $ 78,961

DECREE
For the foregoing reasons, we reverse that portion of the trial court's judgment assessing R. Lewis Smith, Jr., CPA, A Professional Accounting Corporation, with any expense or penalty for the clients which left James, Hardy & Smith (now Hardy & Smith) on the withdrawal of R. Lewis Smith, Jr., CPA, A Professional Accounting Corporation, from James, Hardy & Smith (now Hardy & Smith); we also reverse that portion of the trial court's judgment assessing R. Lewis Smith, Jr., CPA, A Professional Accounting Corporation, with any allocation of overhead expenses incurred beyond April 30, 1996, the agreed date of withdrawal of R. Lewis Smith, Jr., CPA, A Professional Accounting Corporation, from James, Hardy & Smith (now Hardy & Smith); and, further, we amend the remainder of the judgment to reflect our above calculations. R. Lewis Smith, Jr., CPA, A Professional Accounting Corporation, is awarded the sum of $78,961, with judicial interest to be calculated from April 30, 1996, the agreed date of withdrawal from James, Hardy & Smith (now Hardy & Smith). All costs are assessed to James, Hardy & Smith (now Hardy & Smith).
REVERSED IN PART, AMENDED IN PART AND, AS AMENDED, AFFIRMED.
CARAWAY, J., concurs with written reasons.
CARAWAY, J., concurring.
I agree with the reasoning and conclusion of the majority opinion, but concur to add the following. The Partnership argues that the valuation of a withdrawing partner's interest in a continuing partnership under La. C.C. art. 2823 is different from the valuation or determination of the liquidating distribution to a partner when a partnership terminates under La. C.C. art. 2833. The value which we now place on Smith's partnership interest under La. C.C. art. 2823 is in effect equal to the value he would have received had the partnership terminated and its principal asset, the accounts receivable, been proportionally distributed under La. C.C. art. 2833.
While the Partnership now argues that Shopf v. Marina Del Ray Partnership, 549 So.2d 833 (La.1989) requires that a minority discount be applied to the value of Smith's 22.60% interest, the Shopf analysis was apparently never the focus at trial. Consequently, we have no evidence indicating how Smith's 22.60% interest is proportionately worth less in relation to the fractional interests of the other partners or indicating what percentage of discount might apply. Since each partner must contribute professional services to produce the profits of the partnership which are then shared, it is difficult to view any one partner in an analogous position to that of a minority shareholder of a corporation. Smith could not be excluded from participation in the business and his earnings were not subject to the determination and will of the majority in the manner that dividends are declared in a corporation. Cf., Fincher v. Claiborne Butane Co., Inc., 349 So.2d 1014 (La.App. 2d Cir.1977).
In the real estate business venture at issue in Shopf, the court employed a market *1004 value analysis emphasizing the development potential of the business. Application of the concept of a market value to a professional's partnership interest however does not fit. A professional like Smith contributes his unique services to the partnership. Smith cannot transfer his role and interest as a partner to another CPA. A partnership interest is not transferable when viewed from the perspective of La. C.C. art. 2807 which requires the partners' unanimous consent to admit a new partner. While a partnership interest can be shared with a third person (La.C.C. art. 2812), that option for a transfer to or sharing with a third person for value is unworkable for a partner who must continue to contribute his services to the partnership. From the perspective of any hypothetical transferee of Smith's partnership interest who might be admitted into the firm, there could be no guarantee that Smith's former clients would continue to choose the accounting services of Smith's replacement. Smith's partnership interest from this view is unmarketable. Thus, its value must be determined in the same manner as it would be determined upon liquidation of the partnership and payable in cash without a partition of the specific assets of the ongoing partnership. See La. C.C. art. 2824 and its revision comment (a).
NOTES
[1] The sole shareholder, director and officer of each professional accounting firm was Roy W. James, Jr., Lonnie G. Hardy, Jr. and R. Lewis Smith, Jr., respectively.
[2] There is conflicting testimony concerning the time period for which compensation was agreed upon, either for the preceding year or the following year.
[3] A base compensation agreement was not reached in 1994 and the base compensation agreement for the previous year, 1993, was simply continued.
[4] Although apparently not an issue in this proceeding, we note that the 1996 federal income tax return of the partnership reflects a loan to the partnership with a principal balance of $101,000. While the partners have taken into account this accrued interest payable, there is no testimony concerning the principal balance of the loan. We can only assume that the loan was for the purchase of the furniture, fixtures and other leasehold improvements shown on the depreciation schedule attached to the 1996 partnership federal income tax return. Since Smith is not asserting any claim to the value of those assets, we further assume that the assets were retained by the partnership with Smith being released of any responsibility of the payment of the principal balance of the loan.
[5] Mr. James and Mr. Hardy were each bound by a prior written agreement that they had with the accounting partnership of HMV. Mr. James and Mr. Hardy were previously partners of HMV and withdrew in 1988 to form the Defendant/appellee partnership. Under the terms of the HMV partnership agreement, a withdrawing partner was liable to HMV for an amount equal to 10% of its annual revenues from any client formerly served by HMV for the next ten years.
[6] Smith actually withdrew from the Partnership on May 24, 1996, but James, Hardy & Smith agreed that the effective date of the withdrawal would be April 30, 1996.
[7] The trial court did not give an explanation of how it arrived at this amount and it is not readily ascertainable from the ruling.
[8] If there is no agreement on the amount to be paid under Articles 2823 and 2824, any interested party may seek a judicial determination of the amount and a judgment ordering its payment. La. C.C. art. 2825.
[9] In a supplemental brief, the Partnership argues that Smith should be assessed a minority discount against his portion, relying heavily on the supreme court case of Shopf v. Marina Del Ray Partnership, 549 So.2d 833 (La.1989). In that case, the supreme court assessed a "minority discount" to the withdrawing partner's portion in a three member real estate development partnership. The court reasoned that in the marketplace a minority interest would not attract as high a price as a majority interest because the interest of the withdrawing partner in Shopf was "relatively illiquid" and difficult to market. We decline to use the "market value" calculation theory for three reasons. First, Marina Del Ray was a commercial partnership with a negative book value. Its primary asset was real estate, which is far less liquid than the accounts receivable in a professional partnership that relies on the partners' skills for income as we have here. Second, both parties, at trial, in their original briefs and at argument, addressed only the "net asset value" approach to the valuation of Smith's interest in the Partnership. It was not until the Partnership's supplemental brief that the Shopf case was first mentioned or that it was suggested that the "market value" approach be utilized to determine the value of Smith's interest in the Partnership. There was no evidence at trial as to what a willing buyer would pay in order to acquire Smith's interest. Third, the "market value" approach is not feasible and virtually impossible in the context of a professional partnership where the value of the partnership and its ability to generate income are inextricably tied to the identity of the partners. This is in contrast to the Shopf case where the value of the partnership and its ability to generate income was tied to its asset which was separable from the individual partners and where the partnership's value and income potential are completely unrelated to the identity of its partners. In summary, the "net asset value" approach is the only approach available in the case sub judice.
[10] Smith's base salary percentage for 1995 was 21.13%, which the trial court used. We do not find it equitable to preclude Smith from benefitting from the blended percentage which he earned and received in 1995; however, we cannot speculate as to any increase in that percentage for the year 1996.
[11] Although the Partnership asserts that Smith should be responsible for his percentage of the Partnership overhead incurred after the withdrawal, the Partnership does not attribute to Smith any of the income earned by the Partnership subsequent to the withdrawal.
[12] Smith testified that compensatory time is not an expense to the partnership if it is actually used. During the rest of the year there is not always enough work to bill an eight-hour day. It is on these occasions that the employees are allowed to use their accrued compensatory time because the employees would not be billing hours. If an employee chooses not to use his accrued compensatory time during the year, however, it becomes an expense since the partnership must pay the employee at the end of the year for any unused accrued compensatory time.
[13] We find Succession of Conway, 41 So.2d 729, 215 La. 819 (La.1949), which the Partnership argues is the controlling case on this issue, is distinguishable from the instant case. In Succession of Conway, the business being valued was a salvage business. Like in Conway, the accounts of a commercial business can be sold for a price in the open market regardless of who operates the business. Clients, however, choose their certified public accountants based on their unique skills and other qualities.
[14] Of this $70,133, Smith was entitled to receive 22.60%, or $15,850. Since there had been distributions to Smith as of April 30, 1996, in the amount of $25,082, the parties' financial analysis was presented at trial in the above format and showed that Smith owed back to the partnership $9,232 as an adjustment to the firm's 1996 income through April 30.