STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

07-988

STEPHEN SCULL THOMSON

VERSUS

LILY MARIE STEEL THOMSON

**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20040128
HONORABLE DAVID BLANCHET, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Jimmie C. Peters, Judges.

**COOKS, J., DISSENTS IN PART AND ASSIGNS WRITTEN REASONS.**

AMENDED AND, AS AMENDED, AFFIRMED.

Philip Collins Kobetz
P. O. Box 80275
Lafayette, LA 70598-0275
Telephone: (337) 291-1990
COUNSEL FOR:
    Plaintiff/Appellee - Stephen Scull Thomson

Susan L. Theall
Christine M. Mire
The Theall Firm
1304 Lafayette Street
Lafayette, LA 70501
Telephone: (337) 264-9000
COUNSEL FOR:
    Defendant/Appellant - Lily Marie Steel Thomson

**THIBODEAUX, Chief Judge.**

This case involves the judicial partition of community property between the plaintiff-appellee, Stephen Scull Thomson ("Thomson"), and the defendant-appellant, Lily Marie Steele Thomson ("Steele"). The parties owned an interest in numerous companies, the majority of which were established for the purchase, development, or maintenance of parcels of real estate. Some of the companies were acquired during the marriage, and some were acquired before the marriage. Prior to the date of the marriage in April 1995, the parties executed a matrimonial agreement regarding their separate assets and the income derived from the separate assets.

Following a six-day bench trial to partition the property, the trial court issued written reasons and a judgment finding that the matrimonial agreement, in general, preserved the fruits of separate property as separate assets. The court then analyzed each asset and its fruits to determine whether distributions from the companies were subject to reimbursement claims or whether the income derived was the result of the labor and industry of the owner of the asset. The trial court then partitioned the community property and calculated the equalizing payment.

Lily Steele filed an appeal, assigning four errors to the trial court regarding its rulings on the matrimonial agreement, the characterization of certain income, the reimbursement claims of Thomson, and the equalizing payment. Stephen Thomson answered the appeal and asserted one assignment of error regarding the characterization of income from two of his separate properties, the reimbursement claim associated with those properties, and the equalizing payment. The parties do not dispute the partition itself regarding which properties were assigned to each.

For the following reasons, we amend and, as amended, affirm the judgment of the trial court.

# I.

## ISSUES

As to Lily Steele's appeal, we must decide:

(1)     whether the trial court erred in determining that the matrimonial agreement reserved the fruits and revenues of separate property acquired before the marriage;

(2)     whether the trial court erred in applying a minority ownership interest discount when determining the market value of certain limited liability companies;

(3)     whether the trial court erred in determining that distributions of $658,706.00 from Thomson Brothers Construction belong to Thomson's separate estate; and

(4)     whether the trial court erred in determining that Steele owes Thomson $288,332.03 in reimbursements.

As to Stephen Thomson's appeal, we must decide:

whether the trial court erred in denying Thomson's reimbursement claims for rental income from Thomson Brothers Investments, LLC, and the return on a passive investment in Park Esplanade Limited Partnership.

# II.

## FACTS AND PROCEDURAL HISTORY

Lily Steele and Stephen Thomson executed a premarital agreement on April 3, 1995, prior to their marriage on April 22, 1995. The one-page premarital agreement provided in pertinent part as follows:

> The parties agree to modify the community property system so that certain properties acquired during the marriage will be characterized as the separate property of the acquiring spouse and that the income or the increase in value of a separate asset shall be or shall remain part of the separate estate of that party's separate estate.

2

Accordingly, each party shall administer his/her own separate estate so that all income earned from a separate asset or the increase in value of a separate asset shall remain as part of that party's separate estate.

Pension plan, and/or IRA accounts or earnings attributable to those accounts shall be the separate property of that particular spouse.

And further, Lily M. Steele hereby expressly renounces her right to concur in the alienation, encumbrance or lease of community assets, if such assets are shares of stock, partnership interests, condominium interests, and/or limited liability company interests.

During the marriage, the couple acquired various assets that were either amicably divided or awarded at trial and not disputed in this appeal, including a family home, contents of the home, two vehicles, and a one-third interest in a camp. The parties also acquired minority ownership interests (less than a 50% ownership interest) in more than a few limited liability companies, each of which owned real estate, and each of which had debt on the real estate owned. Each party had claims for reimbursement, either for one-half of the separate funds used to benefit the community under La.Civ.Code art. 2365,[1] or for one half of the community funds used to benefit a spouse's separate property under La.Civ.Code art. 2364.[2]

The trial was divided into two phases in order to determine (1) the value of the community interests in the limited liability companies; and (2) the existence and value of each party's claims for reimbursement. In his thirty-four page Reasons for Ruling, the trial judge provided a comprehensive analysis of his findings at trial.

---

[1]La.Civ.Code art. 2365: "If separate property of a spouse has been used to satisfy a community obligation, that spouse, upon termination of the community property regime, is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used . . . ."

[2]La.Civ.Code art. 2364: "If community property has been used to satisfy a separate obligation of a spouse, the other spouse is entitled to reimbursement upon termination of the community property regime for one-half of the amount or value that the property had at the time it was used."

Of the numerous rulings, Steele disagrees with and appeals the trial court's finding that: (1) the premarital agreement reserved the fruits of all separate property as separate; (2) a minority ownership interest discount should be used in determining the fair market value of the real estate owned by the limited liability companies; (3) income from Thomas Brothers Construction, LLC should be classified as Thomson's separate property; and (4) Steele owes Thomson reimbursement for his use of separate property to pay community obligations under La.Civ.Code art. 2365.

Thomson answered Steele's appeal and also appeals the trial court's denial of reimbursement to him with regard to rental income from Thomson Brothers Investments, LLC, and income on a passive investment that he made prior to marriage in Park Esplanade Limited Partnership. For the following reasons, we amend and, as amended, affirm the judgment of the trial court.

III.

## LAW AND DISCUSSION

### Standard of Review

The trial court is vested with great discretion in effecting a fair partition of community property. *Collier v. Collier*, 00-1263 (La.App. 3 Cir. 7/18/01), 790 So.2d 759, *writ denied,* 01-2365 (La. 12/7/01), 803 So.2d 30. An appellate court may not set aside a trial court's findings of fact in absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A reviewing court must keep in mind that if a trial court's findings are reasonable based upon the entire record and evidence, an appellate court may not reverse such findings even if it is convinced that had it been sitting as trier of fact it would have weighed that evidence differently. *Housely v. Cerise*, 579 So.2d 973 (La.1991). The basis for this principle of review is grounded

4

not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts.

## The Matrimonial Agreement

Steele contends that the trial court erred in determining that the premarital agreement reserved the fruits and revenues of separate property acquired before the marriage.

The Louisiana Civil Code provides that the "natural and civil fruits of the separate property of a spouse are community property" but that "a spouse may reserve them as his separate property by a declaration made in an authentic act or in an act under private signature duly acknowledged." La.Civ.Code art. 2339. Likewise, La.Civ.Code art. 2331 provides that "[a] matrimonial agreement may be executed by the spouses before or during marriage" and that "[i]t shall be made by authentic act or by an act under private signature duly acknowledged by the spouses."

The "Marriage Contract" executed by Steele and Thomson prior to marriage in April of 1995 was in authentic form pursuant to La.Civ.Code art. 1833 because it was signed by the parties and two witnesses in the presence of a notary. Steele argues that the agreement preserves as separate property only the fruits of separate property acquired "during" the marriage but does not preserve the fruits of separate property acquired "before" the marriage. We disagree. The specific language at issue is in the following paragraph:

> The parties agree to modify the community property system so that certain properties acquired *during* the marriage will be characterized as the separate property of the acquiring spouse *and* that the *income or* the *increase* in value of *a* separate asset *shall be* or *shall remain* part of the separate estate of that party's separate estate. (Emphasis ours).

5

In the first part of the sentence, the agreement modifies the community property regime, which generally provides that property acquired prior to marriage is separate, pursuant to La.Civ.Code art. 2341,[3] to also include "certain properties acquired *during* the marriage." The second part of the sentence following the word "*and*" provides that the income from "*a separate asset shall be*" separate, or "*shall remain*" separate, indicating that the fruits of any separate asset, whether designated as separate by the agreement or already separate before the agreement, are to remain as part of the separate property.

Steele cites La.Civ.Code art. 2053, providing that a doubtful provision must be interpreted in light of the nature of the contract. While we do not find the provision doubtful, it is clear that the nature of this contract was to keep the fruits of a separate property separate along with that piece of property. To apply the contract to post-marriage acquisitions rendered separate by the agreement only, and not apply the contract to pre-marriage acquisitions that are already separate by statute, would be logically untenable. Likewise, Steele's assertion of La.Civ.Code art. 2054 only serves to support the trial court's ruling. Article 2054 provides:

> When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.

---

[3]La.Civ.Code art. 2341: "The separate property of a spouse is his exclusively. It comprises: property acquired by a spouse prior to the establishment of a community property regime; property acquired by a spouse with separate things or with separate and community things when the value of the community things is inconsequential in comparison with the value of the separate things used; property acquired by a spouse by inheritance or donation to him individually; . . . and things acquired by a spouse as a result of a voluntary partition of the community during the existence of a community property regime."

We believe, as did the trial court, that the word "a" in front of "separate asset" means "any" separate asset. Further, the inclusion of income from property acquired before marriage is implied, given the statutory laws on pre-marriage acquisitions, and given the purpose of the contract. As argued by Steele herself, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La.Civ.Code art. 2050. We affirm the trial court's ruling on this issue and find that the contract preserved the fruits or income, and the increase in value, of all separate property as separate.

**Minority Ownership Interest Discount**

Steele and Thomson owned fractional minority interests in various limited liability companies. Rather than owning controlling interest, their ownership interests in the companies ranged roughly from a sixteen percent (16%) ownership interest to a thirty-three percent (33%) ownership interest in each company. In determining the value of the community's interest in each company, the court looked at the appraised value, added the company's bank accounts, cash, and other assets, deducted the company's mortgage debt and other liabilities, and then multiplied the net worth of each company by the community's actual ownership percentage. Finally, the trial court applied a minority ownership interest discount of either twenty percent (20%) or thirty percent (30%) to seven of the eight companies, effectively reducing the value of each asset. The rationale behind such a discount is that owners of fractional minority shares have no control in running the company, making their interest less valuable on the open market.

For example, if a company's net worth is $100,000.00, and the parties own a twenty percent (20%) interest in the company, the community's interest in that

company would be $20,000.00. If a twenty percent (20%) minority ownership interest discount is applied, the fair market value then becomes $16,000.00, due to a $4,000.00 reduction. Steele contends that the trial court erred in applying such a minority interest discount when determining the fair market value of each of the companies because the community's ownership interest in each company was not being sold to a third party but was being assigned to one of the parties in the partition. We disagree.

The trial court relied upon *Shopf v. Marina Del Ray Partnership*, 549 So.2d 833(La.1989), which discussed the proper standard of asset valuation as fair market value rather than book value, although book value may be a factor in determining fair market value. The Louisiana Supreme Court in *Shopf* defined fair market value as follows:

> Fair market value is defined generally as the price that a willing buyer would pay to a willing seller for a certain piece of property in an arm's length transaction, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. See Black's Law Dictionary 537 (rev. 5th ed 1979).

*Shopf,* 549 So.2d at 839.

In *Shopf*, the issue was a withdrawing partner's twelve percent (12%) minority ownership interest in a real estate partnership, and the remaining partners' acquisition of the twelve percent minority interest at fair market value. When the plaintiff and the remaining partners could not agree as to the value of the plaintiff's share, the plaintiff demanded a judicial determination of the sum due him for the value of his twelve percent interest. Even though the interest in the partnership was not being sold at market or going to an outside investor, the Supreme Court applied a one-third (33.3%) discount in setting the fair market value, explaining as follows:

The most significant adjustment must be made in recognition of the fact that plaintiff's share is a minority interest in a closely held business. The determination of the value of a fractional share in a business entity involves more than fixing the value of the business and multiplying by the fraction being evaluated, especially when the share is a minority interest. A minority interest may be uniquely valuable to the owner, but may have considerably less value to an independent third party, because the interest is relatively illiquid and difficult to market. G. Desmond & R. Kelley, Business Valuation Handbook, ¶ 11.01, 11.07 (1977).

*Id.* At 840.

The Supreme Court in *Shopf* further explained that the purchaser already owned or controlled a majority of the shares and had more interest in increasing his percentage than an outside investor would have in acquiring a minority share in the venture. Accordingly, the court applied the discount, stating that this was necessary "in order to determine the fair market value of plaintiff's share *in a true arm's length transaction*." *Id.* (Emphasis added). Based upon the foregoing rationale of the Supreme Court in *Shopf*, we agree with the trial judge in this case wherein he stated: "It is of no consequence that a sale to a third party is not taking place."

In this case, the experts disagreed. The trial court noted that Steele's financial expert opined that a minority discount would not be appropriate even if a sale to a third party were intended. On the other hand, Thomson's expert advocated application of a thirty percent (30%) discount across the board in valuing all of the limited liability companies owned by the community since all ownership interests were minority interests. The trial court determined that a minority ownership discount should be applied. However, the court found Steele's argument persuasive regarding the court's consideration of each company's articles of incorporation and operating agreements.

Accordingly, the trial court analyzed each LLC individually, considered how the other shares in each company were distributed, who had voting rights, encumbrance rights, alienation rights, transfer rights, etcetera, and applied a twenty percent (20%) discount to some companies, a thirty percent (30%) discount to others, and a zero percent (0%) discount to one company. The court's variances in the amounts of the discounts are not being appealed; rather, the issue is the discountability itself in determining fair market value. We find no abuse of discretion in the trial court's method of valuation of the community's ownership interests in the limited liability companies.[4]

**Distributions from Thomson Brothers Construction, Inc.**

Thomson testified at trial that prior to his marriage he owned three companies with his brother, George: Pelican Real Estate, a real estate business; Thomson Brothers Construction, Inc. (TBC), a construction company; and Thomson Brothers Investments, L.L.C. (TBI), a company that owns two parcels of real estate. The two brothers split the profits from the companies after salaries and operating expenses were paid. Thomson worked for and ran Pelican Real Estate, and his brother worked for and ran the construction company, TBC. The trial court found that deposits of Steve Thomson in the amount of $658,706.00 constituted distributions from TBC that belong to Thomson's separate estate. These funds are

---

[4]While not providing specific argument on the issue, Steele makes a conclusory assertion that the trial court did not value the properties at the time of trial pursuant to La.R.S. 9:2801. We note that the competing appraisals were done at different time frames prior to trial, that the trial court provided an exhaustive analysis comparing the parties' appraisers and their methodologies for updating or adjusting their appraisals, and that the trial court did not abuse its discretion in making its valuations based upon the evidence presented by the parties, or in choosing one appraiser over the other. See *Razzaghe-Ashrafi v. Razzaghe-Ashrafi*, 558 So.2d 1368 (La.App. 3 Cir. 1990); *Queenan v. Queenan*, 492 So.2d 902 (La.App. 3 Cir.), *writ denied*, 496 So.2d 1045 (La.1986); *Ellington v. Ellington*, 36,943 (La.App. 2 Cir. 3/18/03), 842 So.2d 1160, *writ denied,* 03-1092 (La. 6/27/03), 847 So.2d 1269; *Major v. Major*, 94-1885 (La.App. 4 Cir. 4/3/96), 671 So.2d 571; *Roberts v. Roberts*, 542 So.2d 517 (La.App. 5 Cir.), *review denied*, 547 So.2d 1317 (La.1989).

therefore the subject of Thomson's reimbursement claim based upon his assertion that he used some of the funds to pay for community obligations during the marriage.

Steele contends that the trial court erred in determining that these distributions belong to Thomson's separate estate because they were a result of his effort, skill, or industry. Therefore, they belong to the community and are not reimbursable to Thomson. Steele cites the Louisiana Civil Code which provides in part that community property comprises property "acquired during the existence of the legal regime through the effort, skill, or industry of either spouse." La.Civ.Code art. 2338.[5]

In its Reasons for Ruling, the trial court stated as follows:

> MR. THOMSON showed deposits from Thomson Brothers Construction, Inc., totaling $685,206.00. MR. THOMSON established that he was not employed by Thomson Brothers Construction, Inc., and that he did not work for the company on a regular basis. He did testify that he made referrals to the construction company of individuals and companies who needed construction work performed, but denied that he was paid for such referrals.
>
> Mr. Thomson was questioned as to several checks totaling $26,500.00 made payable to him from Thomson Brothers Construction, Inc., which indicated "bonus" in the memo section. Mr. Thomson alleged that the coding contained in the memo section was incorrect, but he failed to produce any other witnesses to corroborate this testimony. As such, Mr. Thomson failed to prove that the distributions marked "bonus" were not a result of referrals made by him to the company which would be the result of his effort, skill or industry. Accordingly, the Court will reduce MR. THOMSON's claim by $26,500.00 and finds that Mr. Thomson received distributions from Thomson Brothers Construction, Inc., in the amount of $658,706.00 that belong to his separate estate.

---

[5] La.Civ.Code art. 2338: "The community property comprises: property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; property acquired with community things or with community and separate things, unless classified as separate property under Article 2341; property donated to the spouses jointly; natural and civil fruits of community property; damages awarded for loss or injury to a thing belonging to the community; and all other property not classified by law as separate property."

11

We find no manifest error in the trial judge's reasoning on this issue or in his reduction of Thomson's claim for the three checks totaling $26,500.00 (12/30/96 check for $9,500.00; 6/30/97 check for $7,000.00; 11/20/01 check for $10,000.00) and marked "bonus" in the memo line. However, the judge did fail to address a fourth TBC check to Steve Thomson dated 12/31/01 for $14,000.00, which was also designated as "bonus" in the memo line. Accordingly, we affirm the trial court's ruling on this issue but amend the court's total amount by subtracting the additional $14,000.00 bonus check for a total separate property distribution from TBC to Steve Thomson of $644,706.00.

**Separate Property Used to Pay Community Obligations**

Steve Thomson's reimbursement claim is predicated on his assertion that he used his separate funds, mostly derived from TBC as shown above, to pay for community expenses and obligations under La.Civ.Code art. 2365. In her fourth assignment of error, Lily Steele contends that the trial court erred in determining that she owes Thomson $288,332.03 in reimbursements because the court erroneously used a "global approach" in calculating the reimbursement claim and erroneously placed the burden of proof on Steele. We find no error in the court's approach but amend the amount of the reimbursement due Mr. Thomson to $283,782.03 in keeping with our correction of the amount of separate funds in the previous section.

Louisiana Civil Code Article 2365 provides:

> If separate property of a spouse has been used to satisfy a community obligation, that spouse, upon termination of the community property regime, is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used. The liability of a spouse who owes reimbursement is limited to the value of his share in the community after deduction of all community obligations.

12

Nevertheless, if the community obligation was incurred for the ordinary and customary expenses of the marriage, or for the support, maintenance, and education of children of either spouse in keeping with the economic condition of the community, the spouse is entitled to reimbursement from the other spouse regardless of the value of that spouse's share of the community.

In this case, the parties stipulated to the accuracy of 91 pages of check register entries on Steve's two accounts, covering eight years of marriage, from January 1, 1996 through December 31, 2003. The stipulation was to the accuracy of the checks written, the dates, the amounts and the payees, and to the accuracy of the deposit dates and amounts, although Lily would not stipulate to the source of all deposits. In addition to the check register entries, the record contains voluminous exhibits containing articles of incorporation, copies of deposit slips, deposit details, distribution details from the various companies, and cancelled checks.

The deposits totaled well over $2,600,000.00 dollars for the eight-year period. Except for a small balance divided evenly between the parties as a result of the partition, the remainder was spent during the marriage. The trial court found that the funds deposited were used to pay both community and separate obligations during the marriage, that Steve had deposited $658,706.00 (which we corrected to $644,706.00) of his separate funds from TBC, and had spent $67,632.02 for the benefit of his separate property. In his written reasons, the trial judge cited La.Civ.Code art. 2361 which provides: "Except as provided in Article 2363, all obligations incurred by a spouse during the existence of a community property regime are presumed to be community obligations."[6] Accordingly, the trial court found that Steve Thomson was entitled to the presumption of Article 2361 that the money in his

---

[6]Louisiana Civil Code Article 2363 defines separate obligations generally as those incurred before marriage, or during marriage if not for the common interest of the spouses or for the other spouse.

accounts, except for the $67,632.02, was spent on community obligations, and that the burden was on Steele to overcome the presumption, which she failed to do.

The court cited *Dupree v. Dupree*, 41,572 (La.App. 2 Cir. 12/20/06), 948 So.2d 254, where the second circuit concluded that a spouse depositing $284,008.32 in separate funds was entitled to the legal presumption of Article 2361 that the funds were used to satisfy community obligations, and the other spouse had the burden of proving that the expenditures were not for the common interest of the spouses. We disagree with Steele's assertion that the use of the deposits constitutes an improper "global approach," particularly given the detail in the business records and exhibits in this case.

Moreover, Steele stipulated to the accuracy of the checks written on the check registers, the large majority of which reflect the normal and usual bill payments and expenses that are associated with running a household and several businesses. We recognize that Steele is asserting the general and doctrinal burden of proof in the cases interpreting La.Civ.Code art. 2365. Those cases hold that the burden of proof is on the party claiming reimbursement to show that separate funds existed and were used to satisfy the community obligation. *Ward v. Ward*, 32,617 (La.App. 2 Cir. 12/10/99), 748 So.2d 619. We also note that the presumption of La.Civ.Code art. 2361 is statutory. It is of no moment in the present case because both burdens have been met. Steve Thomson proved that separate funds existed in the account because he provided distribution records from the companies at issue, along with deposit slips, deposit details and copies of the checks made out to him for the distributions, and he provided 91 pages of check and deposit register entries, which collectively corroborated his testimony as to which deposits were from his separate companies and which deposits were from community companies.

14

Once it has been shown that expenses and obligations arose during the marriage, the statutory presumption that the obligations and expenses are community obligations may be rebutted only through presentation of facts proving the obligation to be a separate obligation. *See Sims v. Sims*, 28,470 (La.App. 2 Cir. 6/26/96), 677 So.2d 663. Obligations incurred by a spouse during the existence of a community property regime are presumed to be community obligations with few exceptions, but the presumption is rebuttable upon proof by clear and convincing evidence that the debt was not incurred for the benefit of the community. *In re Succession of Moss*, 00-62 (La.App. 3 Cir. 6/21/00), 769 So.2d 614, *writs denied,* 00-2834 (La. 12/8/00), 776 So.2d 462, 06-2861 (La. 2/2/07), 948 So.2d 1084. Steele provided no such evidence in this case.

In the alternative, Steele argues that the trial court found that $180,000.00 of the money in Thomson's accounts was used to buy large amounts of prescription pain medication illegally for both parties, and that because an obligation cannot exist without a lawful cause under La.Civ.Code art. 1966, the illegal drug expenditure cannot form the basis of a reimbursement claim. Steele muddies the waters here. The trial court did not reimburse Steve Thomson for money spent on drugs. More specifically, the trial court determined that Steve wrote $220,546.74 of the checks to "cash" and that some of the cash was given to Lily Steele to buy the drugs for both of them. In reviewing the record, we also found that Steve wrote checks to Lily designated "personal miscellaneous" in an almost equal amount. Therefore, it is reasonable, and in fact necessary, to believe that the money for drug purchases of $180,000.00 had to come out of the $440,000.00 in checks to "cash" and to Lily and had nothing to do with the reimbursement of $283,782.03 that Steve is seeking from his deposits of over $2.6 million. Clearly, most of the funds deposited

15

were community funds, and most of the checks written were for community expenses, none of which are reimbursable.

Steve is not seeking reimbursement for drug purchases. He is seeking reimbursement for a relatively small amount of separate funds used to pay part of a large amount of community obligations. Steve's reimbursement claim is based upon the $644,706.00 from TBC and the following distributions determined by the trial court to be Steve's separate income: Harding Street Rentals, $19,800.00; O'Brien Operations, $4,159.93; Hibernia Stock, $58,921.82. Therefore, Steve's separate income totaled $727,587.75 (corrected from the trial court's figure of $741,587.75). The trial court deducted $67,632.02 for checks written for the benefit of Steve's separate properties, then deducted a thirty-five percent tax liability, and finally divided the figure by two for the one half reimbursement of separate funds used for the benefit of community property under Article 2365.

Using the same formula, we corrected the court's resulting figure from $219,035.61 to $214,485.61. The trial court then added Steve's remaining reimbursement claims for his use of separate funds to benefit the following community interests: a stipulated reimbursement of $50,551.00 used as a down payment on the community home; $3,250.00 for the benefit of Hugh Wallis Condominiums, L.L.C.; $5,642.92 for the benefit of Berard, L.L.C.; and $9,852.50 for community taxes. Thus the trial court calculated a total reimbursement claim of $288,332.03, which we corrected to $283,782.03. Accordingly, we amend the reimbursement amount in favor of Steve Thomson to $283,782.03 and otherwise affirm the trial court's judgment on the reimbursement issue.

## Steve Thomson's Assignment of Error

Finally, in answering the appeal of Lily Steele, Stephen Thomson asserts one assignment of error against the trial court. Thomson contends that the trial court erroneously denied him reimbursement for expending his separate funds from two of his separate companies for the benefit of the community, and that he is entitled to reimbursement of one-half of the amount expended (less 35% taxes paid on funds) pursuant to La.Civ.Code art. 2365. Specifically, he contends that the trial court erred in denying his reimbursement claims for rental income from Thomson Brothers Investments, L.L.C. (TBI - income from two rental houses, $39,000.00), and for the return on a passive investment in Park Esplanade Limited Partnership (PE - proceeds from the sale of an apartment complex in New Orleans, $114,998.00). Thomson acquired an interest in both of these companies prior to his marriage. Therefore, they are both part of his separate estate.

Pursuant to the matrimonial agreement, which we affirmed as a valid agreement, any fruits or income derived from these separate properties during the marriage would be considered preserved as separate. However, citing *Ross v. Ross,* 02-2984 (La. 10/21/03), 857 So.2d 384, the trial court articulated its duty to determine whether the incomes from Thomson's separate properties were in fact "civil fruits," preserved as separate, or funds resulting from Thomson's effort, skill, or industry, which would render them community property, in spite of the matrimonial agreement, as explained more specifically below.

In *Ross*, the Louisiana Supreme Court held that the burden was upon the former husband, an independent insurance agent with State Farm, to prove that his insurance renewal commissions received during the marriage were not community property, pursuant to the presumption of La.Civ.Code art. 2340: "Things in the

17

possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove that they are separate property." Reversing the First Circuit Court of Appeal, the Supreme Court in *Ross* held that the renewal commissions were the result of the husband's labor, skill, or industry and thus were community property, in spite of the husband's declaration of paraphernality reserving the fruits of his paraphernal and separate property.

During a lengthy analysis, the *Ross* court expressed the difficulties of the courts in determining whether a spouse's property should be classified as earnings or fruits. The court quoted Spaht and Hargrave, Louisiana Civ. Law Treatise, *Matrimonial Regimes,* § 3.2 at p. 47 (1997), which states, "Property acquired by the effort, skill or industry of a spouse is community, and there is no mechanism provided for making it separate." *Id.* at § 3.8, p. 64. Ultimately, the court found that the majority of Mr. Ross's income from his insurance company came from the renewal of policies, and that he provided significant services to his existing policyholders to keep their business, including entertainment, advertising, newsletters, explaining claims, accident reports, returning phone calls, answering questions, sending birthday and Christmas cards, and general "schmoozing." *Ross*, 857 So.2d at 397. The court stated that its holding was consistent with settled law and in accord with the notion that "to the extent that labor is producing some benefit, the community ought to share in the profit of that labor." *Id.* at 398.

In this case, the trial court fully and comprehensively discussed the *Ross* case and the authorities cited by the Supreme Court in *Ross*. The trial court determined that Steve Thomson did not overcome Article 2340's presumption that income is community because the courts in Louisiana have recognized that substantial

18

amounts of effort, labor and industry are required to manage and operate rental properties. Accordingly, the trial court designated the funds from TBI and PE as community earnings which are not subject to a reimbursement claim. We note that the trial court analyzed the fruits of eight separate properties of Mr. Thomson and determined that the income from five of them constituted Thomson's separate property, one of which was a *legitimate* passive rental income profit from a property that the brothers rented *from* their father and sublet for more than they paid. Thomson's contentions are without merit.

### Equalizing Payment

We turn now to the effect that the correction of Steve's reimbursement claim has on the equalizing payment. Lily Steele was awarded all of the sale proceeds from the house, and Steve Thomson was awarded the limited liability companies, worth over three times as much, because of his expertise in real estate. The court correctly calculated an equalizing payment from Steve to Lily of $365,242.95. Lily had a reimbursement claim of $100,169.30 (uncontested on appeal), and Steve has a larger reimbursement claim of $283,782.03. Therefore, the net reimbursement that Lily owes Steve is $183,612.73. This amount is subtracted from the equalizing payment ($365,242.95 - $183,612.73), and Steve now owes Lily $181,630.22 (corrected upward from the trial court's figure of $177,080.22).

IV.

### CONCLUSION

Based upon the foregoing, we amend the separate property distribution amount from Thomson Brothers Construction to Steve Thomson by adjusting it downward from $658,706.00 to $644,706.00, and we amend the total reimbursement

19

claim of Steve Thomson by adjusting it downward from $288,332.03 to $283,782.03. We further amend the equalizing payment that Steve Thomson owes Lily Steele by adjusting it upward from $177,080.22 to $181,630.22. We affirm the trial court in all other respects.

**AMENDED AND, AS AMENDED, AFFIRMED.**

STEPHEN SCULL THOMSON

VERSUS

LILY MARIE STEEL THOMSON

**COOKS, J., dissents in part.**

I find merit in Mrs. Thomson argument that a portion of Mr. Thomson's reimbursement claim from the community stems from the *illegal* purchase of large amounts of prescription pain medication. The record shows that approximately 2.6 million dollars in deposits were made into Mr. Thomson's checking account, of which we have determined $644,706.00 of these deposits were from his separate income. Based on the husband's own testimony, it was established he and his wife used $180,000.00 in cash to illegally purchase drugs. The record also reveals Mr. Thomson wrote checks to cash drawn on his account in an amount over $200,000.00 and checks to his wife from the same account in a similar amount. It is from these checks that the cash to buy the illegal drugs was obtained.

The trial court and the majority find no merit in the wife's argument that this $180,000.00 used for the purchase of illegal drugs cannot be included in a valid reimbursement claim. The trial court's reasoning for not reducing the husband's reimbursement claim for this amount was two-fold: (1) that is was impossible to determine "whether separate or community funds were used to purchase the illegal drugs"; and (2) "since both parties equally used [the drugs], the Court will not use the purchase of illegal drugs as justification to deny Mr. Thomson reimbursement for separate funds used for the benefit of the community." This reasoning is flawed. First, although we cannot determine what portion of the illegal drugs purchased came

from separate or community funds, we do know that the money used to buy the drugs came from Mr. Thomson's checking account. Approximately one-quarter (¼) of all funds deposited into this account, the trial court determined, came from Mr. Thomson's separate property, for which he now seeks reimbursement. It is simply unreasonable to assume that no portion of the $180,000.00 came from Mr. Thomson's separate income, and all of it came from the community funds deposited into the account. However, this is what the trial court's ruling requires us to conclude. It is more reasonable, and in keeping with public policy, to conclude that one-quarter (¼) of the funds used to acquire the drugs came from Mr. Thomson's separate income. Correspondingly, this portion of his separate income cannot form part of his reimbursement claim. To do as the trial court and the majority have done is to countenance the reimbursement of monies used to purchase illegal drugs against both statutory law and public policy. Under La.Civ.Code art. 2365 an obligation cannot exist without a lawful cause, and the purchase of illegal drugs cannot be a recognized community obligation. Any funds used to purchase illegal drugs cannot be part of a valid reimbursement claim. Second, the fact that both parties used the drugs in an equal amount is irrelevant and does not provide legal justification for ignoring the clear mandate found in La.Civ.Code art. 2365.

The majority apparently accepts Mr. Thomson's argument that he was "not seeking reimbursement for drug purchases. . . [but rather] for a relatively small amount of separate funds used to pay part of a large amount of community obligations." This reasoning, much as the trial court's, asks us to unrealistically assume that no part of the $180,000.00 used to purchase illegal drugs came from the separate funds deposited by Mr. Thomson. For the reasons set forth above, I choose not to do so, and respectfully dissent from that portion of the majority's decision.