# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 21-371

**SHOP RITE, INC., AND
TOBACCO PLUS, INC.**

**VERSUS**

**SHAWNE GIELEN GARDINER**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 2019-10957
HONORABLE LAURIE A. HULIN, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**CHARLES G. FITZGERALD
JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of D. Kent Savoie, Candyce G. Perret, and Charles G. Fitzgerald, Judges.

**AFFIRMED AS AMENDED.**

**Steven G. Durio**
**Lauren Noel Maurer**
**Durio, McGoffin, Stagg & Ackermann**
**Post Office Box 51308**
**Lafayette, Louisiana  70505-1308**
**(337) 233-0300**
**Counsel for Defendant/Appellant:**
**Shawne Gielen Gardiner**

**Christopher L. Zaunbrecher**
**Briney Foret Corry**
**Post Office Box 51367**
**Lafayette, Louisiana  70505-1367**
**(337) 456-9835**
**Counsel for Plaintiffs/Appellees:**
**Shop Rite, Inc.**
**Tobacco Plus, Inc.**

**FITZGERALD, Judge.**

In this appeal, we are asked to review the trial court's determinations of fair value for the shares of stock of a withdrawing shareholder.

**FACTS AND PROCEDURAL HISTORY**

Shawne Gielen Gardiner is a withdrawing shareholder of two corporations: Shop Rite, Inc., and Tobacco Plus, Inc. Shawne's subject interest in Shop Rite consisted of 39.216 shares of stock (or a 3.8% ownership interest). And for Tobacco Plus, she owned 1.292 of its outstanding shares (or a 3.95% ownership interest).

On July 23, 2018, Shawne sent a formal notice of withdrawal to each company in accordance with Louisiana's shareholder oppression statute. La.R.S. 12:1-1435. Under this statute, Shawne's notice operated as a sixty-day irrevocable offer to sell her shares to each company at fair value. La.R.S. 12:1-1435(D).

In response, Shop Rite and Tobacco Plus accepted Shawne's offer to sell, though each company denied that she was an oppressed shareholder. Thereafter, the parties had an additional sixty days to negotiate fair value. La.R.S. 12:1-1435(F). And in the event of impasse, each party had the right to file suit to have the court determine fair value. La.R.S. 12:1-1436(A).

Thus, when the parties failed to reach an agreement as to "fair value," Shop Rite and Tobacco Plus, as Plaintiffs, filed a declaratory action against Shawne, asking the court to determine the fair value of the subject shares of stock. In answering Plaintiffs' suit, Shawne filed a reconventional demand for the same relief plus legal interest.

The valuation trial was held in September 2020, and a final Judgment was rendered on November 10, 2020. The trial court also issued written reasons that same day. In sum, the trial court found that the fair value of Shawne's 3.8%

ownership interest in Shop Rite was $1,250,338. The trial court then found that the fair value of Shawne's 3.95% interest in Tobacco Plus was $607,810. Judgment was rendered in favor of Shawne and against Plaintiffs in those amounts. It is from this Judgment that Shawne has appealed.[1]

On appeal, Shawne asserts the following assignments of error:

1. In determining "fair value," the trial court erred as a matter of law in employing a discount for tax effecting, in spite of this Court's controlling interpretation in *Kolwe v. Civil and Structural Engineers, Inc.*, 2018-398 (La.App. 3 Cir. 2/21/19), 264 So.3d 1262, 1278, *writ denied,* 2019-0483 (La. 5/20/19), 271 So.3d 1269. *Kolwe* explicitly rejected such discounts from "fair value" and was a statutory interpretation binding on the lower court as a matter of law[.]

2. The trial court also erred, as a matter of law, or abused its discretion, by finding that a sale of the Companies was "inevitable," rather than hypothetical, and discounting the fair value of the plaintiff Companies for a hypothetical sale. The court's opinion conclusory states that "tax effecting" is "appropriate" without any factual basis for its conclusion that a sale was "inevitable."

3. The trial court also erred, as a matter of law, or abused its discretion, by applying a discount for collectability of the related party accounts receivable of John Dan Gielen and Gielen Property, Inc. These were the majority shareholders or their affiliates in the Companies, and both were evidently solvent.

4. The trial court erred as a matter of law by failing to follow *Kolwe* and award interest from date of Judgment until paid.

## LAW AND DISCUSSION

At the outset, we must address a jurisdictional issue raised by Plaintiffs in their appellee brief. In essence, Plaintiffs argue that Shawne's devolutive appeal is moot—and we therefore lack subject matter jurisdiction—because they (Plaintiffs) paid the Judgment by tendering the full amount into the registry of the district court.

---

[1] From her father's succession, Shawne received other shares of stock issued by these companies. These legacy shares are not at issue in this appeal.

2

In support, Plaintiffs point to *Fluker Farms v. James*, 226 La. 303, 76 So.2d 311 (1954).

*Fluker Farms*, however, involved a partition by licitation. There, the Louisiana Supreme Court held that after the property was sold at a sheriff's sale and the proceeds had been paid into the registry of the court, the appellant's rights against Fluker Farms were limited to the proceeds of the sale. But as Shawne correctly points out, a dissatisfied party in a partition by licitation can apply for a stay of the sheriff's sale. This was not done in *Fluker Farms*. The appellant's rights were therefore limited to the sale proceeds.

*Fluker Farms* simply recognized the inherent nature of a partition by licitation, and its holding has no application beyond that context. Here, unlike *Fluker Farms*, Judgment was rendered against Plaintiffs and in favor of Shawne, casting Plaintiffs for payment of the amount of the Judgment. Once Shawne perfected her devolutive appeal, her appellate rights were secured, and Plaintiffs' payment of the Judgment into the court registry did not deprive her of those rights. Shawne's appeal is properly before this court.

## I.     Trial Court's Determination of "Fair Value"

"An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. The trial court's valuation of a withdrawing shareholder's ownership interest is a factual one which shall not be disturbed absent manifest error." *Kolwe*, 264 So.3d at 1269. However, the interpretive aspects of this appeal present questions of law that are reviewed de novo. *See id*.

Louisiana Revised Statutes 12:1-1435, as noted above, is Louisiana's shareholder oppression statute. Subsection A of that statute provides: "If a

3

corporation engages in oppression of a shareholder, the shareholder may withdraw from the corporation and require the corporation to buy all of the shareholder's shares at their *fair value*." La.R.S. 12:1-1435(A) (emphasis added). The definition of "fair value" is addressed in Subsection C, which provides that "[t]he term 'fair value' has the same meaning in this Section . . . as it does in R.S. 12:1-1301(4) concerning appraisal rights, except that the value of a withdrawing shareholder's shares is to be determined as of the effective date of the notice of withdrawal[.]" La.R.S. 12:1-1435(C)(1).

Louisiana Revised Statutes 12:1-1301(4), in turn, states: "'Fair value' means the value of the corporation's shares determined . . . using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal, and without discounting for lack of marketability or minority status[.]"

In *Kolwe*, 264 So.3d at 1281, a different panel of this court addressed the interpretation of fair value, holding that

> the term "fair value" in the context of Louisiana's shareholder oppression statute means the withdrawing shareholder's proportionate interest in the corporation valued as a going concern. Thus, in order to ascertain "fair value," the trial court must first determine the value of the corporation in its entirety and then allocate the withdrawing shareholder his proportionate ownership interest of that value, without applying any discounts at the shareholder level.

Importantly, "fair value" should not be equated with "fair market value." Fair market value is a separate and distinct valuation standard. As explained by the Louisiana Supreme Court, "Fair market value is defined generally as the price that a willing buyer would pay to a willing seller for a certain piece of property in an arm's length transaction, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." *Shopf v. Marina Del Ray Partnership*,

4

549 So.2d 833, 839 (La. 1989). Thus, fair market value contemplates the price that a hypothetical buyer would pay to a hypothetical seller. *Kolwe*, 264 So.3d 1262.

In contrast, "the fair value of shares 'is determined not by reference to what the particular shares would fetch in a hypothetical market sale, but instead by valuing the company *as a whole* and by ascribing to each share its pro rata portion of that overall enterprise value.'" *Id.* (emphasis in original) (quoting Douglas K. Moll, *Shareholder Oppression and the New Louisiana Business Corporation Act*, 60 Loy. L. Rev. 461, 499 (2014)).

### A. *Shop Rite, Inc. (3.8% ownership interest)*

At the valuation trial, the parties presented competing expert testimony as to the fair value of Shawne's 3.8% ownership interest in Shop Rite. Plaintiffs' valuation analyst used the adjusted net asset value method, which is an asset-based approach. Under the adjusted net asset method, the company's assets and liabilities are adjusted to current value, and then the difference between the adjusted assets and liabilities represents the net asset value.

While both experts agreed that this was the proper method to determine fair value, they disagreed as to whether certain adjustments needed to be made to Shop Rite's balance sheet. On appeal, only two adjustments are at issue: first, whether potential trapped-in capital gains taxes should be added as a new liability. And second, whether the receivables owed by John Dan Gielen (Shop Rite's majority shareholder) and Gielen Properties, Inc. (a company affiliated with Shop Rite) should be reduced because of collectability concerns.

Trapped-In Capital Gains Discount

The term "trapped-in capital gains" (or "built-in gains") means that a company owns assets with values that are substantially greater than the amounts at which they

are carried on the books, and thus there would be a capital gains tax if and when the assets are sold.

At trial, Plaintiffs' expert testified that Shop Rite owns substantial real estate throughout Louisiana, and that these properties have increased in value. He explained that these properties are depreciated to an extent each year to offset any taxable income that they might produce. After all, Shop Rite is a C-corporation, meaning that it is taxed at the corporate level. He then noted that the current value of the properties was determined by real-estate appraisers, and the standard of value used by these appraisers was market value, which assumes that the real estate will be sold.

Plaintiffs' expert next explained that Shop Rite, as a going concern, did not have plans to sell any of its real estate. However, when the value of real estate on a company's balance sheet is based on real-estate appraisals, he testified that it is common and accepted to recognize the trapped-in capital gains taxes as a liability on the balance sheet.

To this end, Shop Rite owned twenty-seven properties at the time of the valuation. The appraised market value for all of Shop Rite's fixed assets, including its real estate, was $34,408,279. Yet the book value (cost less depreciation) for the fixed assets was $7,533,357. The difference between the appraised value and book value is the capital gain: $26,874,922. To this amount, Plaintiffs' expert applied a blended federal/state tax rate of 26%. The result is a trapped-in capital gains discount of $6,987,480.

Importantly, this is an entity-level discount, meaning that if Shop Rite sold *all* of its real estate and other fixed assets—which were appraised at $34,408,279—the company would owe $6,987,480 in capital gains taxes. So in applying this discount,

6

Plaintiffs' expert reduced the value of the corporation (total shares outstanding) from $40,792,038 to $33,804,558. This, in turn, significantly reduced the fair value of Shawne's proportionate 3.8% ownership interest.

Shawne's expert, on the other hand, testified that the application of a trapped-in capital gains discount in this instance was improper. He pointed out that Shop Rite had no plans to sell any of its real estate, meaning that any liability for capital gains taxes is speculative and uncertain. To emphasize this point, he provided the following explanation:

> [A.] The companies [(Shop Rite and Tobacco Plus)] have no intent to sell these assets. The tax will not be paid in the foreseeable future and the tax may never be paid, because it's possible for them to dispose of these assets through a future merger with another company.
>
> For example, in 2016, Circle K acquired all of the stores of Valero corner stores. Everybody may be familiar with that, because we had a number of Valero convenience stores in Lafayette. And Valero spun off their stores into a company called CST. And I was a shareholder in Valero and I received stock in CST corner stores when they did that spinoff.
>
> And subsequent to that spinoff, Circle K acquired all the locations of corner stores in a merger whereby the stockholders of CST sold their stock to Circle K in a cash transaction. It is possible that, at some point in the future, Shop Rite, Tobacco Plus may sell their stores to someone like Circle K in a stock transaction.
>
> Q. And the point of that is—
>
> A. And if that were to happen, there would never be any tax paid on these built-in gains. That is the whole reason why it's hypothetical and speculative, because there is no proof that these built-in gain taxes will ever be paid.
>
> So I'm adding back the hypothetical tax for the built-in gains[.]

Ultimately, the trial court agreed with Plaintiffs' expert and applied the trapped-in capital gains discount, thereby reducing the value of the corporation by $6,987,480. In its written reasons, the trial court explained that it applied the

7

discount because "a sale of assets of both companies [(Shop Rite and Tobacco Plus)] is inevitable, not hypothetical."

On appeal, Shawne asserts in her first assignment of error that the statutory concept of fair value adopted by the legislature in La.R.S. 12:1-1435, as interpreted by *Kolwe*, prohibits applying "tax effecting" discounts, such as the trapped-in capital gains discount. We disagree. *Kolwe's* interpretation of "fair value" does not serve as a universal bar for a trapped-in capital gains discount. Under certain circumstances, this type of entity-level discount might be appropriate. But there must be a factual basis for the discount, and this leads us to Shawne's second assignment of error.

In her second assignment, Shawne contends that there was no factual basis to support the trial court's application of a trapped-in capital gains discount, which she refers to as a "tax effecting" discount. We agree. There is nothing in the record to support the trial court's finding that a sale of Shop Rite's assets is inevitable, as opposed to hypothetical. On the contrary, Shop Rite's own expert stated three different times during his direct examination that Shop Rite was not planning on selling any of its assets. And in his summary valuation report, he states that "there is no anticipated sale or liquidation of the company's assets[.]"

A similar situation was presented in *Segura v. Comeaux*, 17-258 (La.App. 3 Cir. 11/2/17), 279 So.3d 418, *writ denied*, 17-2027 (La. 2/2/18), 235 So.3d 1109. *Segura* involved the valuation of a closely held business in a community property partition. The relevant part of the opinion provides as follows:

> Ms. Segura first claims that the trial court erred in failing to "tax affect" the fully depreciated movables owned by Tigress, thereby artificially inflating the value of the company. She claims that the court should have taken into account taxes that would be paid upon a hypothetical sale of the company's movables. . . . Here, the sale of

8

Tigress' movables is not only not required, but the record shows no evidence that any such sale is even likely. Accordingly, the trial court rejected this argument as speculative. We agree.

Ms. Segura retains the benefit of her company using these movables far past the date of the valuation of the company, potentially for many years to come. It is not clear when, if ever, these assets may be subject to any tax liability. The value of the community interests "should not and cannot be predicated on tax consequences of some future uncertain event." *Mexic v. Mexic*, 577 So.2d at 1050. "[T]here is no legal basis by which this court can reduce the value of an asset to reflect a reduction in value as the result of an uncertain future tax liability." *Callender v. Callender*, 625 So.2d 257, 265 (La.App. 5 Cir. 1993), *writ denied*, 93-3080 (La. 2/4/94), 633 So.2d 583. As there is no evidence in this record to suggest any imminent sale of the goods in question, the trial court's decision not to "tax affect" them was reasonable. We can find no manifest error in the trial court's decision.

*Id*. at 420-21.

While the standard of value in a community property partition (fair market value) is different than the valuation standard used in the Louisiana Business Corporation Act (fair value), the reasoning related to tax effecting is the same. In other words, just like in *Segura*, it is not clear when, if ever, Shop Rite will be subject to capital gains taxes. The remaining shareholders will benefit financially from Shop Rite's use of its immovable assets far past the valuation date, potentially for many years to come. It is not clear when, if ever, these assets will be sold, and the fair value of the company (and Shawne's subject interest) cannot be predicated on the tax consequences of some future uncertain event.

In the end, if the claimed tax consequence is a future one that will arise upon the occurrence of some unknown future event, the future tax consequence (whether at the entity level or shareholder level) should not be considered in determining the fair value of a withdrawing shareholder's ownership interest. The uncertainty as to if and when the tax-creating event will occur, the tax rates generally at that uncertain time, and other presently unknown future factors justify this conclusion.

Here, there is no evidence in the record before us to suggest any imminent sale of the assets in question. The trial court thus manifestly erred in allowing a discount for trapped-in capital gains taxes.

Downward Adjustments to Company Receivables

On the effective date of the valuation, Shop Rite's majority shareholder, John Dan Gielen, owed the company $321,441. On the company's books (balance sheet), this sum was presented as a current asset, and more specifically as a receivable "Due from Stockholder" in the amount of $321,441. In estimating fair value, Plaintiffs' expert reduced this receivable to $252,940, which is a downward adjustment of $68,501. The following reason for the adjustment is given in the expert's summary valuation report:

> We adjusted the value of the Company's Due from Stockholder account to reflect its *fair market value* as the long-term receivable from John Dan Gielen is not evidenced by a note, does not have interest being accrued, and does not have payments being made. We adjusted the reported amount to present value as of the valuation date using and [sic] interest rate equal to the company's cost of debt and a five-year term. [Emphasis added.]

In addition to the receivable owed by its majority shareholder, the balance sheet also reflected a receivable "Due from Affiliates" in the amount of $3,906,170. The affiliated company that owed this receivable was Gielen Properties, Inc. In estimating fair value, Plaintiffs' expert reduced this receivable from $3,906,170 to $3,073,737, which is a downward adjustment of $832,433. Just like before, Plaintiffs' expert explained that "[w]e adjusted the value of the Company's Due from Affiliate to reflect its *fair market value*[.]" (Emphasis added).

At trial, Shawne's expert testified that these adjustments were inappropriate, explaining as follows:

A.    [Plaintiffs' expert] adjusted due from affiliates by $832,433 and he reduced the due from shareholder by $68,501. Just addressing both of them simultaneously, these are monies of the companies—of the company that the controlling shareholders diverted to personal use, interest free, at no compensation to the company. So what [Plaintiffs' expert] did, he styles it as a present value calculation, which I find to be nonsensical because, when you do a present value calculation, you determine the present value of something you don't currently have but will get in the future, like discounted future cash flow. These receivables were on the books at a stated value as of the valuation date.

Q.    In other words, they were after?

A.    Right. And their value was stated at the valuation date. The way [Plaintiffs' expert] converts this to a present value calculation is he makes the supposition that these receivables will remain outstanding, interest free, for another five years and presumably will be collected at the end of those five years. And then he discounts that collection five years out, back to present value, at the company's cost of capital.

      To me, that is a fictitious present-value calculation. You don't have to determine the calculation—the present value of something that is already on the books at today's present value. I don't understand the logic behind positing, supposition that the receivables are worth any less than what they are stated at, on the books of the company, unless you have a finding that there is doubt as to liability regarding the creditor or there is doubt as to the collectability.

      And [Plaintiffs' expert] acknowledged in his testimony on Tuesday that his adjustment had nothing to do with liability or collectability but merely the fact that they didn't have a stated interest rate and didn't have a[ny] documentation of actually being a receivable. But these assets are on the book[s].

In her third assigned error, Shawne asserts that the trial court erred by applying a downward adjustment to these related-party accounts receivable. She refers to this adjustment as a collectability discount. She submits that a collectability discount is unwarranted because there is no evidence that either of the related parties is unable to satisfy their obligation to Shop Rite. We agree.

At the outset, we note that the standard of value is fair value, not fair market value. In addition, the adjustment made by Plaintiffs' expert is what is known as a normalizing adjustment to the company's balance sheet. The basic idea of this sort

11

of adjustment is to present data so that it represents the economic reality of the company. But here, the downward adjustment to the related-party receivables has nothing to do with collectability. And thus, the adjustment has nothing to do with the economic reality of the company.

At the time of the valuation, John Dan Gielen was deceased. However, no evidence was presented at trial that his estate was insolvent or that his estate was not responsible for the debt to Shop Rite. The same is true for the solvency and liability of Gielen Properties. Again, even Plaintiffs' expert acknowledged at trial that these adjustments had nothing to do with collectability; the adjustments were merely applied because the debts had no documentation, no specified interest rate, and no amortization schedule.

We therefore conclude that the trial court manifestly erred in applying downward adjustments to the related-party receivables. There was simply no factual basis to do so.

Restated concisely, the trial court clearly erred in determining the fair value of Shawne's 3.8% ownership interest in Shop Rite by (1) applying a trapped-in capital gains discount of $6,987,480; (2) applying a $68,501 downward adjustment to the receivable "Due from Shareholder"; and (3) applying a $832,433 downward adjustment to the receivable "Due from Affiliates." Adding back these three amounts increases the fair value of Shop Rite's shares from $32,903,624 to $40,792,038. Thus, the fair value of Shawne's 3.8% ownership interest is increased from $1,250,338 to $1,550,097.44.

### B. Tobacco Plus, Inc. (3.95% ownership interest)

In determining the fair value of Shawne's 3.95% ownership interest in Tobacco Plus, Plaintiffs' expert used a weighted (blended) approach. In doing so,

12

he first estimated the value of Tobacco Plus using an income approach, specifically utilizing the discounted cash flow method. He then did the same thing using the adjusted net asset method. Next, he blended the results, giving slightly more weight to the asset-based approach, and estimated the fair value of the company's shares (total shares outstanding) to be $15,387,589. And from here, he estimated that the fair value of Shawne's proportionate 3.95% ownership interest was $607,810.

The trial court agreed with this estimate of fair value and rendered Judgment accordingly. But in doing so, the trial court again applied a trapped-in capital gains discount and downward adjustments for related-party receivables.

Tobacco Plus, like Shop Rite, owns significant real-estate holdings throughout Louisiana. Tobacco Plus is also a C-corporation. And Tobacco Plus, just like Shop Rite, has no plans to sell any of its real estate.

Nevertheless, in valuing Tobacco Plus using the adjusted net asset method, Plaintiffs' expert applied a trapped-in capital gains discount of $2,503,018. He then applied a downward adjustment of $12,735 to a receivable "Due from Shareholder," along with a downward adjustment of $460,572 to receivables "Due from Affiliates." And in valuing Tobacco Plus using the discounted cash flow method, Plaintiffs' expert applied the same downward adjustments to the related-party receivables. But again, just like Shop Rite, the adjustments to the accounts receivable had nothing to do with collectability.

On appeal, Shawne makes the same assignments of error: she objects to the trapped-in capital gains discount, and she objects to the downward adjustments for the related-party receivables. And for the same reasons as before, we agree with Shawne.

13

In sum, the trial court clearly erred by applying a trapped-in capital gains discount and by making downward adjustments to the related-party receivables. By adding these back, the fair value of Tobacco Plus (using same weighted approach) increases from $15,387,589 to $17,362,707.20. Thus, the fair value of Shawne's 3.95% ownership interest is increased from $607,810 to $685,826.93.

## II. Legal Interest

In her final assignment of error, Shawne asserts that under La.Code Civ.P. art 1921, the trial court had no discretion to deny legal interest since she prayed for an award of interest in her pleadings. We review this assignment using the abuse of discretion standard of review.

Louisiana Code of Civil Procedure Article 1921 states that "[t]he court shall award interest in the judgment as prayed for or as provided by law." In her reconventional demand, Shawne prayed "for legal interest on the amount of Judgment until it is paid."

"When a party prays for an award of interest in a pleading seeking a money judgment, the court lacks discretion to deny interest on the award." *Aupied v. Aupied*, 09-636, pp. 6-7 (La.App. 5 Cir. 3/9/10), 38 So.3d 899, 903-04. "Since the word 'shall' [in Article 1921] is mandatory, courts lack discretion to deny interest if it is prayed for or provided by law." *Unisys Corp. v. La. Office of Motor Vehicles Through Hodges*, 18-556, p. 26 (La.App. 1 Cir. 12/28/18), 270 So.3d 637, 654.

Given the mandatory language of La.Code Civ.P. art. 1921, we conclude that the trial court abused its discretion in failing to award Shawne legal interest from the date of the November 10, 2020 Judgment.

**DECREE**

For the above reasons, the trial court's Judgment of November 10, 2020, is amended to reflect that the fair value of Shawne Gielen Gardiner's 3.8% ownership interest in Shop Rite, Inc., was $1,550,097.44 as of July 25, 2018; therefore, Shop Rite, Inc., owes Shawne Gielen Gardiner $1,550,097.44, plus legal interest from November 10, 2020, until paid.

We further amend the trial court's Judgment to reflect that the fair value of Shawne Gielen Gardiner's 3.95% ownership interest in Tobacco Plus, Inc., was $685,826.93 as of July 25, 2018; therefore, Tobacco Plus, Inc., owes Shawne Gielen Gardiner $685,826.93, plus legal interest from November 10, 2020, until paid.

The Judgment of the trial court is affirmed in all other respects.

The costs of this appeal are assessed 50% to Shop Rite, Inc., and 50% to Tobacco Plus, Inc.

**AFFIRMED AS AMENDED**